# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUSTIN G.,
*On behalf of Jennipher B.,*[1]                    :
  Plaintiff,                                          :
                                                           :
v.                                                           :          Civil No. 3:24-CV-01881 (VAB)
                                                           :
MARTIN O'MALLEY,                                             :
COMMISSIONER OF SOCIAL                                       :
SECURITY,                                                    :
  *Defendant*.                                       :

## RULING AND ORDER ON PENDING MOTIONS

Justin G., on behalf of Jennipher B. ("Plaintiff"),[2] has filed an administrative appeal

under 42 U.S.C. § 405(g) against Frank J. Bisignano, the Commissioner of Social Security

("Defendant" or "Commissioner"), following the denial of Jennipher B.'s application for

disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").[3]

The Commissioner moves the Court to enter judgment affirming his final decision. Mem.

of L. in Support of Commissioner's Mot. for an Order Affirming the Commissioner's Decision,

ECF No. 26, 1 ("Def.'s Mem."). Justin G. has moved the Court for an order reversing the

---

[1] In opinions issued in cases filed under Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and refer to any non-government party solely by first name and last initial in order to protect the privacy interests of Social Security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases, ECF No. 5 (Dec. 19, 2022).

[2] Justin G. has been named substitute party on behalf of his late mother Jennipher B., who passed away on November 1, 2022. Complaint, ECF No. 1, 1; Administrative Transcript, ECF No. 18, 15050.

[3] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

decision of the Commissioner and remanding for the sole purpose of calculating benefits. Br. in Support of Pl.'s Mot. to Reverse the Decision of the Commissioner, ECF No. 23-1, 39 ("Pl.'s Mem."). Alternatively, Justin G. moves the Court to reverse the decision of the Commissioner and remand the matter for a *de novo* hearing and new decision. *Id.* at 40. Justin G. also asks the Court to approve an award of attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412. *Id.*

The issues presented are (1) whether the Administrative Law Judge ("ALJ") failed to develop the record in violation of this Court's order; (2) whether the ALJ properly applied the treating physician rule in determining Jennipher B.'s residual functional capacity ("RFC"); and (3) whether the ALJ's findings at Step Five were supported by substantial evidence.

For the reasons explained below, Justin G.'s motion is **GRANTED in part and DENIED in part**.

The Commissioner's motion for an order affirming his decision is **DENIED**.

The Commissioner's Decision is **VACATED** and **REMANDED** for further proceedings in accordance with this decision.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[4]

i.  <u>Medical Conditions and Diagnoses</u>

Jennipher B. had chronic obstructive pulmonary disease ("COPD"), emphysema, asthma, degenerative disc disease of the lumbar spine, neck and shoulder pain, diabetes mellitus, obesity, adjustment disorder, major depressive disorder, anxiety disorder, hypothyroidism, glaucoma,

---

[4] This section generally summarizes Jennipher B.'s medical history and conditions, but given the length of the record, it is not exhaustive. The factual background provided here focuses on the aspect of Jennipher B.'s medical history that underlies the parties' dispute, i.e., the effect of her mental health conditions, pulmonary conditions, and degenerative disc disease on her employability.

overactive bladder/diabetic neuropathy of the bladder, history of rib fractures, carpal tunnel syndrome, and substance use disorder that was in remission. Administrative Tr., ECF No. 18, 2459 ("Tr."). Because the claim before this Court concerns Jennipher B.'s entitlement to benefits between March 18, 2016 and June 30, 2020, the Court will focus on the parts of the record pertaining to this period.

Jennipher B.'s medical records indicate that her mental health conditions predate her alleged onset date of disability, March 18, 2016. *See* Tr. at 86 (on August 2, 2013, Dr. Evan Ginsberg reported that the Plaintiff had a history of depression); *see also id.* at 408-411, 413 (in September 2014, Plaintiff was in-patient at Yale New Haven Hospital for depression, anxiety, and substance use). While the record indicates ephemeral improvements in Jennipher B.'s mental health, her providers consistently note worsening depression and anxiety symptoms between March 18, 2016 and June 30, 2020. *See, e.g., id.* at 1059-1066, 1150, 1436, 3690. Jennipher B. reported having breakdowns and suicidal thoughts but denied plan or intent. *Id.* at 1001-03, 1872. Her primary care physician, Dr. David Riccio, and her pulmonologist, Dr. Michael Imevbore, opined that her mental health was often correlated with her physical health. *Id.* at 12619, 3690. Jennipher B. was prescribed various medications to manage her mental health conditions. *Id.* at 1064, 968-972. While she reported using marijuana in February 2016, *id.* at 1099, by October 2016, she reported being fully abstinent, *id.* at 1862.

The record also reflects several physical impairments, namely COPD, emphysema, asthma, degenerative disc disease of the lumbar spine, neck and shoulder pain, diabetes mellitus, obesity, hypothyroidism, glaucoma, overactive bladder/diabetic neuropathy of the bladder, history of rib fractures, and carpal tunnel syndrome.[5]

---

[5] In his August 14, 2024 decision, ALJ Molleur found that only the following physical conditions were "severe" as described in 20 CFR Part 404, Subpart P, Appendix 1: degenerative disc disease of the lumbar spine status post

Jennipher B. had been diagnosed with asthma and diabetes mellitus preceding her onset date. Her primary care physician described her diabetes as generally uncontrolled. *Id.* at 1967. Her body mass index ("BMI") as recorded at doctor appointments throughout the time period in question placed her in the range of obesity. *See, e.g., id.* at 1196-97, 1440, 1967, 3692.

In September 2016, she was also diagnosed with COPD and emphysema.[6] On multiple occasions, Jennipher B. presented to the emergency room with respiratory distress. *See id.* at 3645-73, 746-74, 1221-58. Her providers prescribed corticosteroids to treat her pulmonary conditions. *See id.* at 695. She was later hospitalized with diabetic ketoacidosis precipitated by pneumonia and the steroids prescribed to treat it. *Id.* at 5377, 3359-93. Plaintiff's counsel claims that Jennipher B.'s long-term use of steroids resulted in severe kidney damage and ketoacidosis, which eventually led to her death. Pl.'s Mem. at 3.

Jennipher B. was diagnosed with degenerative disc disease of the lumbar spine. She reported leg tremors and low back pain which worsened with walking or standing, and improved with sitting or lying down and taking pain relief medication. Tr. at 1876-83. She also reported an inability to stand for more than fifteen to twenty minutes without developing severe back pain. *Id.* at 1618-24, 2161-188.

X-rays taken in October 2016 indicated "moderately severe L5-S1 degenerative disc disease with facet arthropathy" *Id.* at 1173-76. A lumbar MRI showed "degenerative changes spanning the L3-S1 levels." *Id.* In January 2017, Jennipher B. received a lumbar epidural steroid injection to treat her pain, *id.* at 1452-53, which she stated dramatically increased her blood sugar, *id.* at 1832. While Dr. Riccio initially suggested a neurosurgery consultation for a

---

discectomy with radiculopathy; right shoulder degenerative joint disease; chronic obstructive pulmonary disease/emphysema, and diabetes mellitus type 1. Tr. at 11999.
[6] On March 8, 2017, Dr. Imevbore noted that her September 2019 chest X-ray indicated ground glass opacities, emphysema, and 4-millimeter lung nodules. Tr. at 2110-2111.

discectomy, *id.* at 1436, Yale Neurosurgery declined to operate on her, as she had a "full range of motion lumbosacral spine and straight leg raise normal and neuro," *id.* at 1805. Other doctors cautioned that her pulmonary disease and obesity posed a significant obstacle for a successful operation. *Id.* at 1826-28, 3048.

A November 2017 exam revealed an L5 disc bulge with radiculopathy and radiating symptoms down her right lower extremity. *Id.* at 1617. A December 2017 lumbar MRI revealed "low back pain secondary to L5-S1 degenerative disc [and] Right leg pain secondary to right L5-S1 lateral recess stenosis." *Id.* at 2892. On February 27, 2018, Jennipher B. exhibited a positive straight leg raise. *Id.* at 2984-3005. In October 2018, a lumbar CT scan revealed "[m]ildly increased degenerative disc changes at L5-S1 with a posterior disc bulge, facet arthropathy and ligamentum flavum hypertrophy resulting in mild spinal canal stenosis, moderate right and mild left neural foraminal narrowing." *Id.* at 4859. In October 2020, Jennipher B. underwent extensive back surgery. *Id.* at 12627.

i.  Medical Opinions and Assessments[7]

On July 22, 2015, Dr. David Riccio completed a mental RFC questionnaire in which he stated that Jennipher B. was experiencing fifteen symptoms related to her mental health conditions. Tr. at 601-605. He opined that she was limited in one of the specified aptitudes for unskilled work, seriously limited in five of the aptitudes, unable to meet competitive standards in nine, and had no useful ability to function in one aptitude, namely the ability to deal with normal work stress. *Id.* at 603. He stated that Jennipher B.'s condition has lasted or could be expected to last at least twelve months. *Id.* at 605. He also stated that Jennipher B. was "extremely depressed at this time" but said she was "on medication that will hopefully help her with this." *Id.*

---

[7] There are many medical opinions in the record that are relevant to the parties' briefs. The Court notes the pertinent parts of several.

On August 10, 2016, Advanced Practice Registered Nurse ("APRN") Maura Fischer became Jennipher B.'s psychiatric nurse practitioner at Cornell Scott Hill Health Center. On February 26, 2017, APRN Fischer completed a mental RFC questionnaire in which she diagnosed Jennipher B. with recurrent moderate major depressive disorder with anxious distress, mild cannabis use disorder in remission, and severe to moderate tobacco use disorder. *Id.* at 1287. She stated that Jennipher B. was cooperative, but that she had made minimal progress over the past year. *Id.*

She identified eight symptoms: anhedonia; appetite disturbance with weight change; decreased energy; mood disturbance; difficult thinking or concentrating; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; and sleep disturbance. *Id.* at 1288. She opined that Jennipher B. was either limited or seriously limited in all sixteen of the specified aptitudes for unskilled work. *Id.* at 1290. She observed that Jennipher B. "ha[d] poor concentration and struggle[d] to follow through with tasks unless provided direct support." *Id.* She also noted that Jennipher B.'s emotional pain impacts her physical pain. *Id.* APRN Fischer opined that Jennipher B.'s impairments or treatment would cause her to be absent from work more than four days per month and that her impairment has lasted and can be expected to last at least twelve months. *Id.* at 1291.

On March 29, 2017, Dr. Michael Imevbore submitted a letter opining that Jennipher B. would "benefit from environmental modifications not limited to but including a clean, dust and mold free living environment." *Id.* at 1293.

The record contains mental and physical RFC assessments from multiple state agency consultants. In October 2016, Dr. Robert Decarli completed a psychiatric review technique ("PRT") form and a mental RFC assessment and found that Jennipher B. had moderate

limitations in maintaining social functioning and maintaining concentration, persistence, or pace. *Id.* at 106. He opined that she was capable of "simple work" for two hours in an eight-hour day with adequate attention, concentration, and pace, but would struggle for less than one third of the time with prolonged concentration and sustained pace. *Id.* at 110.

Dr. Lawrence Schaffzin, who performed the physical RFC assessment, opined that Jennipher B. could occasionally lift and carry up to fifty pounds and could stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. *Id.* at 108. He also opined that she should avoid concentrated exposure to fumes, odors, dusts, and gases. *Id.* at 109. Upon reconsideration, a different state agency consultant found she could perform unskilled work at the light exertion level. *Id.* at 144.

In November 2016, Dr. Douglas Rau completed a PRT form and mental RFC assessment and found that Jennipher B. had moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace. *Id.* at 137. He opined that she was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods of time, and to complete a normal workday without interruptions from her psychologically based symptoms. *Id.* at 142.

Jennipher B. filed a subsequent application in 2019 that has since been consolidated with this case. In October 2019, Dr. Robert Sutton completed, as part of that subsequent application, a PRT form and a mental RFC assessment. He found that Jennipher B. had "occasional problems with concentration and pace" and that she could "carry through on simple instructions for up to two hours at a time throughout an eight hour day." *Id.* at 2594. He also noted certain moderate limitations with respect to her ability to engage in social interactions. *Id.*

In November 2019, Dr. Aaron Snyder opined that Jennipher B. was limited to unskilled sedentary work. *Id.* at 2596. He found that she could occasionally lift or carry up to 10 pounds, could stand or walk for a total of two hours a day, and could sit for six hours a day. *Id.* at 2591. Dr. Snyder also opined that the Plaintiff should avoid even moderate exposure to fumes, odors, dusts, and gases. *Id.* at 2593.

On June 24, 2020, APRN Erin Martin, who worked for Jennipher B.'s treating provider at the Yale Diabetes Center, wrote that she exhibited "no symptoms related to [diabetes mellitus] at [the] time of [her] last visit." *Id.* at 8770. She also stated that Jennipher B. had no limitations related to her diabetes. *Id.* at 8773-74.

On September 15, 2020, Dr. Imevbore completed a physical capacity statement. He noted that the Plaintiff has suffered from "chronic shortness of breath" and "severe airway obstruction" since March 8, 2016. *Id.* at 8776. He opined that Jennipher B.'s pain and stress would interfere with the attention and concentration needed to perform simple work tasks for one-third of an eight-hour workday. *Id.* at 8777. He stated that Jennipher B. could walk one city block or more without rest or severe pain, could walk one or more blocks on rough or uneven ground, could climb steps without use of a handrail, and had no problems with balance when ambulating. *Id.* He noted that she did have problems with stooping, crouching, and bending. *Id.* He stated that she could sit for one hour at a time, could occasionally lift and carry five pounds. *Id.* at 8778. He indicated that Jennipher B. would be "off-task" for more than thirty percent of an eight-hour workday, and was likely to be absent from work and/or unable to complete eight-hour workday five days or more in a month. *Id.* at 8779. He opined that Jennipher B. would be less than fifty percent as efficient as the average worker. *Id.* Finally, he opined that Jennipher B. would be unable to obtain and retain work in a competitive work environment. *Id.*

8

### B. Procedural History

On December 16, 2013, Jennipher B. filed an application for Title II Social Security DIB and Title XVI SSI, Tr. at 269-72, which was denied by an ALJ on March 14, 2016, *id.* at 80-98. No appeal was taken from that decision. *id.* at 12606.

On August 29, 2016, Jennipher B. filed a new application, *id.* at 273-79, which was denied on October 25, 2016, *id.* at 165-86. On November 4, 2016, Jennipher B. requested reconsideration, *id.* at 187-88, which was denied on January 9, 2017, *id.* at 189-208.

On January 16, 2017, Jennipher B. requested a hearing before an ALJ. *Id.* at 209-10.

On February 5, 2018, ALJ Deirdre R. Horton held a hearing, *id.* at 40-79, and on March 15, 2018, ALJ Horton issued an unfavorable decision, denying Jennipher B.'s claims in their entirety, *id.* at 7-29.

Jennipher B. filed a request for review with the Appeal Council, which the Council denied on January 16, 2019. *Id.* at 1-6.

Jennipher B. appealed the final decision of the Commissioner to this Court, after which the Court issued a ruling remanding the matter for further proceedings. *Id.* at 2562-77.

On May 26, 2021, ALJ John T. Molleur held a hearing.

On July 20, 2021, ALJ Molleur issued a partially favorable decision, finding that Jennipher B. had been disabled since July 1, 2020, but not before. *Id.* at 2452-82.

On September 21, 2021, ALJ Molleur's decision became the final, appealable decision of the Commissioner.

Jennipher B. appealed the Commissioner's final decision to this Court. The Commissioner then moved for a voluntary remand, which the Court granted on March 11, 2022. Complaint, ECF No. 1, ¶16 ("Compl.").

In its remand order, the Court ordered the agency to "mak[e] reasonable attempts to obtain updated opinions from ARPN Fischer, Licensed Professional Counselor ("LPC") Young, Dr. Riccio, and completing the record with missing evidence from Dr. Imevbore; obtain medical expert review of plaintiff's physical impairments during the period at issue; reevaluate plaintiff's residual functional capacity; and, as necessary, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." *Jennipher B. v. Kijakazi*, 21-cv-01351, Order granting Mot. to Remand to Agency, ECF No. 23, 1-2 (March 11, 2022).

On April 27, 2022, the Appeals Council affirmed the grant of benefits as of July 1, 2020, and remanded the matter to determine entitlement to benefits preceding that date. Tr. at 12607. In its remand order, the Appeals Council ordered the ALJ to comply with the District Court's order. *Id.* at 12107.

On November 1, 2022, Jennipher B. passed away. *Id.* at 15050.

On April 15, 2024, ALJ Molleur held a hearing to determine whether Jennipher B. had been disabled between March 18, 2016, and June 30, 2020. *Id.* at 12027-72.

On August 14, 2024, ALJ Molleur found that Jennipher B. had not been disabled during that period. *Id.* at 11993-12026.

On October 14, 2024, ALJ Molleur's April 15, 2024 decision became final Compl. ¶ 20, and this appeal followed.

On June 23, 2025, Justin G. filed a motion to reverse the decision of the Commissioner. Pl.'s Mem.

On August 21, 2025, the Commissioner filed his response. Def.'s Mem.

## II.    STANDARD OF REVIEW

Under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), a district court reviewing a final decision of the Commissioner of Social Security "is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). A district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). The court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Hum. Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran*, 569 F.3d at 112. It is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

A court has the power "to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Shalala v. Schaefer*, 509 U.S. 292, 297 (1993). The court may remand to the agency for further proceedings in cases where the Commissioner "has failed to provide a full and fair hearing, to make explicit findings, or to have correctly appl[ied] the law and regulations." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *see Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999).

Reversals for the sole purpose of calculating benefits are only permitted where the present record shows persuasive proof of disability such that a remand for further proceedings would serve no useful purpose. *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999) (permitting an award of benefits where "the records provided persuasive evidence of total disability that rendered any further proceedings pointless").

## III.    DISCUSSION

### A.  Eligibility for SSI Benefits

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ." *Id.* § 423(d)(1)(A).  In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b); *see also id.* § 423(d)(2)(A) (stating that in order to be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do

his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy," and "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country").[8]

If the claimant is not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, the ALJ proceeds to Step Three to determine whether any identified severe impairment meets or medically equals those identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other

---

[8] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." 20 C.F.R. § 416.920(a)(4)(i)—(v).

work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Sec'y of Health & Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act. However, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.") (citations omitted).

### B. The Underlying ALJ Decision

An ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir. 2004) (citation modified). Legal error includes failure to adhere to the applicable regulations. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Generally, legal error requires remand to the agency. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("Such an error ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence . . . ."); *see also Shalala v. Schaefer*, 509 U.S. 292, 310 (1993) (Stevens, J., concurring) ("[A] court's order to remand a case pursuant to sentence four of § 405(g) necessarily means that the Secretary has committed legal error."). But rather than remand for further agency review, a court may reverse and enter judgment for the claimant "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980). The relevant inquiry is whether there is "persuasive proof of disability" in the record, such that "further evidentiary proceedings would serve no purpose." *Id.*

14

The underlying ALJ decision that the Plaintiff seeks to challenge found that Jennipher B. had not been disabled between March 18, 2016, and June 30, 2020. *Id.* at 11993-12026. The Commissioner asks the Court to affirm the underlying ALJ decision. Def.'s Mem. at 1. Justin G. moves this Court to reverse the Commissioner's decision and remand for the sole purpose of calculating benefits, arguing that the Commissioner "fail[ed] to correctly apply the law and to make reasoned factual findings supported by substantial evidence." Pl.'s Mem. at 39.

Justin G. argues that the ALJ committed three reversible errors: first, the agency failed to develop the record in accordance with the District Court and Appeals Council's remand orders; second, the ALJ failed to apply the Treating Physician Rule; and third, the ALJ's findings at Step Five were unsupported by substantial evidence because the ALJ's questioning of the vocational witness was flawed.

In response, the Commissioner argues that: the ALJ made reasonable attempts to obtain the additional medical evidence and opinions as required by the remand orders; the ALJ was justified in affording limited weight to Dr. Imevbore's opinion; and substantial evidence supports the ALJ's finding that Jennipher B. retained the residual functional capacity to perform work that exists in significant numbers in the national economy and, thus, she was not disabled.

The Court discusses each argument in turn.

   i. <u>The Development of the Record</u>

"It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (cleaned up) (citing *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999)). Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Moreau v. Berryhill,*

No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Id.* (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015)).

Because Jennipher B.'s claim was filed before March 27, 2017, 20 C.F.R. § 404.1513(b)(6), requires the ALJ to obtain a medical source statement from the claimant's treating or examining physicians. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Indeed, the plain text of the regulation does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual functional capacity.") (emphasis in original). "What is valuable about the perspective of the treating physician and what distinguishes this evidence from the examining physician and from the ALJ is [the treating physician's] opportunity to develop an informed opinion as to the physical status of the patient." *Hallet v. Astrue*, No. 3:11-CV-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (citing *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).

The obligation to develop the record is "enhanced when the disability in question is a psychiatric impairment." *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012); *accord Gabrielsen v. Colvin*, 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (citing cases). This is because a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review. *See Gabrielsen*, 2015 WL 4597548, at *4 (noting that an individual with a mental disorder often "adopt[s] a highly restricted and/or inflexible lifestyle within which they appear to function well") (citation and internal quotation marks omitted).

Because Jennipher B. suffered from several compounding physical and mental impairments, "[t]his is not a case where . . . the ALJ may render a common sense judgment about plaintiff's functional capacity." *Jennipher B. v. Berryhill*, 19-cv-00291, Ruling, ECF No. 17, 7 (December 12, 2019).  In 2019, the ALJ's reliance on the RFC assessments of the state agency consultants was "problematic" because none of these consultants treated or examined the Plaintiff. There also existed "no medical opinion from a treating physician, clinician, and/or specialist addressing the functional limitations that flow from Plaintiff's physical and mental impairments to support the ALJ's RFC findings." *Id.* The ALJ therefore had to develop the record by obtaining medical source statements from Jennipher B.'s treating physicians in accordance with agency regulations. *Id.* at 14-15; Tr. at 2456. The ALJ allegedly did not fulfill this obligation.

In her subsequent appeal to this Court, as alleged, "the Record still [did] not contain a medical source statement from any of the clinicians at the Cornell Scott Hill Health Center who provided counseling services to [Jennipher B.] . . . no updated medical source statement from APRN Maura Fischer . . . [and] no medical source statement from Dr. David Riccio, [Jennipher B.'s] long time primary care physician." *Jennipher B. v. Kijakazi*, 21-cv-01351, Mem. in support of Mot. to Reverse the Decision of the Commissioner, ECF No. 21, 6 (March 1, 2022). The Court notes that the current record reflects a September 15, 2020 physical capacity statement conducted by Dr. Imevbore, Jennipher B.'s pulmonologist.

The Commissioner then filed a consent motion to remand to the agency, finding that "additional administrative action is warranted," including "develop[ing] the record in accordance with the District Court's remand order, including making reasonable attempts to obtain updated opinions from ARPN Fischer, LPC Young, Dr. Riccio, and completing the record with missing

evidence from Dr. Imevbore." *Jennipher B. v. Kijakazi*, 21-cv-01351, Consent Mot. to Remand to Agency, ECF No. 22, 1 (March 11, 2022). The Court granted the motion and once more directed the agency to comply with the requirements of the Court's 2019 remand order. *Jennipher B. v. Kijakazi*, 21-cv-01351, Order granting Mot. to Remand to Agency, ECF No. 23, 1-2 (March 11, 2022).

On April 15, 2024, the ALJ held a hearing at which vocational expert Edmond Calandra and medical expert Jerisa Johnson Berry, M.D., testified. On April 16, 2024, the New Haven Hearings Office sent requests for information to LPC Young, Cornell Scott Hill Health Center at two locations, Dr. Riccio, Dr. Imevbore, and APRN Fischer. Tr. at 15203-15314. The agency sent fax follow-ups on May 7, 2024. *Id.* On May 20, 2024, Cornell-Scott informed the agency that APRN Fischer was not a provider there. *Id.* at 15307. The agency allegedly took no further action.

Justin G. argues that the ALJ's requests for information sent to LPC Young, Dr. Riccio, Dr. Imevbore, and APRN Fischer were facially insufficient because they "contained no limitation as to time and [were] worded in the present tense." Pl.'s Mem. at 20. Justin G. argues that because "a deceased individual can do nothing," the forms were "fatally flawed." *Id.* Justin G. further argues that the ALJ sent the wrong forms, for example sending a mental health RFC form to her primary care physician, who was not her mental health provider. *Id.* at 21. After receiving no response from the follow-up requests, in Justin G.'s view, the ALJ should have taken further steps to secure the medical opinions. *Id.*; *see id.* ( The "ALJ had the unquestioned authority to issue subpoenas ad testificandum to compel the attendance of the providers at a supplemental hearing, at which their testimony as to [the Plaintiff's] capacities at the time at issue could have been obtained.").

In response, the Commissioner argues that the ALJ complied with agency regulations requiring the ALJ to make "every reasonable effort" to obtain the medical source statements. Def.'s Mem. at 9. He also argues that the initial forms were proffered to Plaintiff's counsel, who provided no written comments, questions, or requests for a subpoena. *Id.* Because Plaintiff did not raise the insufficiency of the forms to the ALJ, the Commissioner argues that those issues are now waived before this Court. *Id.* (citing *Carvey v. Astrue*, 2009 WL 3199215, *14 (N.D.N.Y. Sep. 30, 2009) ("The failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal.")). Finally, the Commissioner argues that while the ALJ has an affirmative duty to develop the record, so too does Plaintiff's counsel have a concurrent duty to obtain evidence in support of the Plaintiff's claim. *Id.* at 10.

The Court disagrees.

An ALJ must "make every reasonable effort to help [the claimant] get medical evidence from [his or her] own medical sources and entities that maintain [his or her] medical sources' evidence." 20 C.F.R. §§ 404.1512(b), 416.912(b). The regulations define "every reasonable effort" as an initial request for evidence from a medical source and, if the evidence is not received, one follow-up request to obtain the information. 20 C.F.R. §§ 404.1512(b)(i), 416.912(b)(i).

Reasonability, however, considers the circumstances of the case. *See Harris o/b/o N.L.K. v. Berryhill*, 293 F. Supp. 3d 365, 369 (W.D.N.Y. 2018) (holding that the ALJ failed to make every reasonable effort where the claimant's impairments were primarily mental in nature, the sole treating mental health care source refused to provide records, the evidence suggested serious difficulties in one or more areas of mental functioning, and the ALJ declined to exercise his subpoena power) (citing 20 C.F.R. § 416.912); *cf. Roxanne C. v. Kijakazi*, 628 F. Supp. 3d 405,

415 (D. Conn. 2022) (holding that the agency complied with the regulations where it made four requests).

While the agency complied with the text of the regulation by making a request and following up twenty-two days later, other factors necessitate additional efforts on the agency's part. First, one of Jennipher B.'s primary impairments is psychiatric. *See Lacava v. Astrue*, 2012 WL 6621731, at *11 (the obligation to develop the record is "enhanced when the disability in question is a psychiatric impairment."). Second, the record lacks a physical capacity statement from Jennipher B.'s primary care physician, Dr. Riccio, whose opinion may be entitled to controlling weight. *See Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) ("A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques."). Finally, the ALJ has been directed multiple times, by both the Appeals Council and this Court, to obtain the specified medical source statements.

Under these circumstances, it would have been wholly reasonable and consistent with the ALJ's responsibility, to issue subpoenas "requiring the attendance and testimony of witnesses." 42 U.S.C. § 405(d). This is especially true since the forms sent to the medical care providers inquired about a deceased patient in the present tense, and without making clear that the opinion sought was retroactive.

The agency's failure to obtain the medical source statements constitutes reversible legal error. Where the ALJ fails to develop the record, remand is appropriate. *Rosa*, 168 F.3d at 82-83 ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (internal quotation marks and citations omitted).[9]

---

[9] The Court's determination that the agency did not satisfy its obligation to develop the record does not rest simply on the insufficiency of the forms, but rather the failure of the forms to provide sufficient information about the

Accordingly, the Plaintiff's motion is granted, in part, and the Commissioner's motion is denied, on these grounds.

ii.  The Treating Physician Rule

A treating physician is an "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2). For claims submitted before March 27, 2017, in determining whether a claimant is disabled, the Commissioner is required to give more weight to the medical opinion of the claimant's treating physician, so long as the requirements of the regulation are met, commonly referred to as the "treating physician rule." *Id.*

Under this rule, a treating physician's opinion about a claimant's impairment is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Id.* § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). The Commissioner must set forth "good reasons" for failing to give the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's [sic] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

---

"reasonability" of the agency's efforts. The Court thus does not consider the Commissioner's argument that Plaintiff waived the insufficiency of the forms by failing to raise that issue at the agency level. In any case, the Court does not find the Commissioner's arguments regarding waiver convincing, as the case the Commissioner cites is not binding on this Court and relied on out-of-circuit precedent. *See Carvey v. Astrue*, 2009 WL 3199215, *14 (N.D.N.Y. Sep. 30, 2009) (citing a case from the U.S. Court of Appeals for the Seventh Circuit to support its proposition).

If the ALJ determines that a treating physician's opinion is not entitled to controlling

weight, it must determine how much weight to give it. In doing so, it must "explicitly consider"

several factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of

medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining

medical evidence; and (4) whether the physician is a specialist." *Burgess v. Astrue*, 537 F.3d 117,

129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2)). Failure to apply this rule properly

constitutes legal error. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 344 n.4

(E.D.N.Y. 2010) ("Failure to satisfy the treating physician rule constitutes legal error . . . .").

Because Jennipher B.'s claim was submitted before March 27, 2017, the Commissioner

must apply the treating physician rule in 20 C.F.R. § 404.1527 to her claim. *See* Tr. at 273-79

(stating that Jennipher B. filed her initial claim for disability on August 29, 2016). Jennipher B.'s

treating physicians included Dr. Riccio, her primary care physician, Dr. Imevbore, her

pulmonologist, and Dr. Isis Burgos-Chapman, her psychiatrist at Cornell Scott Hill Health.[10]

As discussed above, the record lacks a relevant medical source statement from Dr.

Riccio, although the record contains several treatment notes and scans from Dr. Riccio. *See* Tr. at

840 (stating that the Plaintiff needed an inhaler); *id.* at 1967 ("So, in summary, we have insulin

[dependent diabetes], which is worse; chronic obstructive pulmonary disease, which is worse;

hypertension, which is controlled; hyperlipidemia, which is fair; anxiety, which is worse; and

gastroesophageal reflux disease, which is worse."); *id.* at 1624, 1612-1617, 1602 (referring

---

[10] The Court notes that on August 10, 2016, medication management transitioned from Dr. Burgos-Chapman to APRN Maura Fischer. However, an APRN is not an "acceptable medical source" under Social Security regulations, and her opinions would not be entitled to deference under the treating physician rule, 20 C.F.R. § 404.1513(a). If APRN Fischer's opinions had been co-signed by Dr. Burgos-Chapman, it would "raise[] the prospect that they should be evaluated under the treating physician rule." *Wiggins v. Colvin*, No. 3:13-cv-1181 (MPS), 2015 WL 5050144, at *2 (D. Conn. Aug. 25, 2015); (citing *Godin v. Astrue*, No. 3:11-cv-881 (SRU), 2013 WL 1246791, at *3 (D. Conn. Mar. 27, 2013)).

Plaintiff to specialist for back pain and related symptoms); *id.* at 3689-3696 ("Her diabetes is worse. Her hemoglobin A1C is up to 8.1. She has polyuria and polydipsia. This makes her very anxious and makes her depression worse. Blood pressure is under decent control. Her weight has gotten worse which has made her GERD worse. She continues to have problems with her COPD. The humid rainy weather today has made it worse. Her thyroid functions are worse. Her TSH is up to 8.4" and her BMI is 36.95); *id.* at 3718 (referring Plaintiff to Yale Rheumatology to assess source of numbness in extremities).

The record contains a February 2017 statement from APRN Fischer, but does not include any statement from Dr. Isis Burgos-Chapman, her treating psychiatrist. ALJ Molleur assigned APRN Fischer's opinion "minimal weight," finding inconsistent APRN Fischer's treatment notes with the severity of the limitations APRN Fischer identified in the specific aptitudes for unskilled work. Tr. at 12007-08. "As an advanced practice registered nurse, [Fischer] is not an 'acceptable medical source' under Social Security regulations and her opinions would not be entitled to deference under the treating physician rule, 20 C.F.R. § 404.1513(a)[.]" *Johnson v. Colvin*, No. 3:14-CV-1446 (MPS), 2016 WL 659664, at *3 (D. Conn. Feb. 18, 2016). Therefore, ALJ Molleur did not violate the treating physician rule with regards to APRN Fischer's assessment.

But ALJ Molleur received notice from Cornell Scott Hill Health that neither APRN Fischer nor Dr. Burgos-Chapman were still employed there. It is likely that Cornell Scott Hill Health no longer possesses Jennipher B.'s records and that Dr. Burgos-Chapman is unable to recall the patient and her condition from nearly a decade ago. APRN Fischer's statements thus may be the only available medical source statements from a mental health professional, and should be weighed accordingly, especially considering the importance of Jennipher B.'s mental impairments for her disability and RFC determinations.

The record contains two medical statements from Dr. Imevbore, specifically the March 2017 letter opining that Jennipher B. would "benefit from environmental modifications not limited to but including a clean, dust and mold free living environment," Tr. at 1293, and the September 2020 physical capacity statement. In the 2020 statement, Dr. Imevbore made several observations: significant respiratory distress; the interference of the Plaintiff's pain and stress with the attention and concentration needed to perform simple work tasks for one-third of an eight-hour workday; ability to walk one city block, on rough or uneven ground, without rest or severe pain; ability to climb steps without use of a handrail; ability to balance when ambulating; no issues with stooping, crouching, and bending; ability to sit for one hour at a time; and the ability to occasionally lift and carry five pounds. *Id.* at 8777-78. He indicated that Jennipher B. would be "off-task" for more than thirty percent of an eight-hour workday, and was likely to be absent from work and/or unable to complete eight-hour workday five days or more in a month. *Id.* at 8779. He opined that Jennipher B. would be less than fifty percent as efficient as the average worker, and that she would be unable to obtain and retain work in a competitive work environment. *Id.*

Dr. Imevbore opinion is entitled "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If an ALJ determines that a treating physician's opinion is not due controlling weight, he or she must "explicitly consider" the *Burgess* factors, namely "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Burgess*, 537 F.3d at 129.

ALJ Molleur gave limited weight to Dr. Imevbore's opinion. He explained that he did "not see a good correlation between the rather extreme lifting limitations and the enormous time off task compared to the ability to walk a city block." Tr. at 12007. He did, however, assign greater weight "to the functional aspect of this opinion" which he stated was "not inconsistent with the ability to perform sedentary work." *Id.*

The Commissioner argues that the ALJ's decision to afford Dr. Imevbore's opinion limited weight was well supported because his opinion was inconsistent with other substantial evidence of record. Def.'s Mem. at 11. Specifically, Dr. Imevbore's opinion that Jennipher B. could lift only up to five pounds, sit for no more than one hour at a time, and sit for no more than four hours of an eight-hour workday was inconsistent with state agency consultant Dr. Aaron Snyder's opinion that she could lift ten pounds as well as sit for about six hours of an eight-hour workday. *Id.*; Tr. at 2591. Defendants also argue that his opinion was inconsistent with the MRIs of Jennipher B.'s lumbar spine and the results of her physical examinations which revealed "full muscle strength and full ranges of motion throughout her arms and legs as well as a normal gait." Def.'s Mem. at 11; Tr. at 2871, 2918, 3016, 7269. With regards to off-task time, the Commissioner argues that Dr. Imevbore's opinion was "overly restrictive" and "inconsistent with the findings of Drs. Decarli, Rau, and Sutton." Def.'s Mem. at 12. Finally, the Commissioner argues that substantial evidence supports the ALJ's determination that Jennipher B. could tolerate exposure up to "higher concentrations of dusts, fumes, gases, or other pulmonary irritants." *Id.* at 12-13.

Justin G. argues that the ALJ erred by discounting Dr. Imevbore's opinion that Jennipher B. should avoid environmental contaminants altogether instead of just "higher concentrations" of pulmonary irritants. Pl.'s Mem. 26-27. Additionally, if ALJ Molleur found inconsistencies in Dr.

Imevbore's medical opinion, the Plaintiff argues that he was obligated to request additional information to resolve the ambiguity. *Id.* at 27-28. Lastly, the Plaintiff argues that ALJ Molleur neither explicitly nor implicitly applied the *Burgess* factors to his decision, constituting reversible error. *Id.* at 24-25.

The Court agrees, in part.

In his 2017 letter, Dr. Imevbore stated that Jennipher B. "will benefit from environmental modifications . . . including a clean, dust and mold free living environment." Dr. Imevbore's statement is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). In the hearing preceding ALJ Molleur's most recent decision, Dr. Jerisa Berry, the agency's medical expert, stated that Jennipher B. "should avoid any place with pulmonary irritants. To avoid environments where there could be pulmonary irritants from the COPD standpoint." Tr. at 12045. State agency consultant Dr. Snyder also opined that the Plaintiff should avoid even moderate exposure to fumes, odors, dusts, and gases. *Id.* at 2593.

ALJ Molleur found both Dr. Berry and Dr. Snyder's medical statements to be credible, assigning them moderate and significant weight, respectively. *Id.* at 12006. Yet, the Commissioner argues that ALJ Molleur's determination is supported because Dr. Imevbore only prescribed a conservative treatment plan, which allegedly evidences a lack of severity or disability. As the record illustrates, Jennipher B. had multiple interacting comorbidities. While she was prescribed "baseline" steroids to treat her pulmonary issues, this steroid use also resulted in kidney damage and diabetic ketoacidosis. *See* Pl.'s Mem. at 3; *see* Tr. at 12006 (ALJ Molleur acknowledging that "[Dr. Berry] testified that the steroids the claimant took for COPD could exacerbate her DM1 causing diabetic ketoacidosis."). The evidence in the record provides enough reason to believe that Dr. Imevbore's "conservative" treatment plan and his medical

26

opinion regarding the severity of Jennipher B.'s limitations were entirely consistent with one another.

The treating physician rule existed to give deference to a physician's opinion regarding "the nature and severity" of a claimant's disability, since "an ALJ cannot substitute [his or] her own judgment for that of a medical professional." *Gunter v. Comm'r of Social Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2010); *see also* 20 C.F.R. § 404.1527(d)(2). By failing to give Dr. Imevbore's opinion controlling weight, the ALJ failed to properly apply the treating physician rule in determining whether Jennipher B. retained the RFC work in settings with pulmonary irritants.

In response to the ALJ's finding that Dr. Imevbore's opinion lacked a "good correlation between the rather extreme lifting limitations and the enormous time off task compared to the ability to walk a city block," Tr. at 12007, Justin G. argues that ALJ Molleur was obligated to request additional information to resolve the ambiguity. In support of this argument, he cites a 2009 case, which, in turn, cites the version of 20 C.F.R. § 404.1512 effective from August 2006 to November 2010. *See Toribio v. Astrue*, No. 06CV6532 (NGG), 2009 WL 2366766, at *8-*10 (E.D.N.Y. July 31, 2009) ("The ALJ must request additional information from a treating physician whenever the attained information is inadequate for determining a plaintiff's disability status." (citing 20 C.F.R. § 404.1512(e) (2006))). This older version of the regulation requires the Commissioner to "seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved[.]" 20 C.F.R. § 404.1512(e) (2006).

But no such obligation exists in the current regulation or the regulation that was in effect when Jennifer B. submitted her claim. *See* 20 C.F.R. § 404.1512 (2015); *id.* § 404.1512 (2017).

ALJ Molleur thus did not violate the treating physician rule by failing to comply with this now void regulation, although his failure to adequately develop the record constitutes reversible legal, as discussed above.

Ultimately, ALJ Molleur failed to "explicitly consider" the *Burgess* factors when assigning limited weight to Dr. Imevbore's opinion. *See Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). Nowhere does ALJ Molleur discuss "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Burgess*, 537 F.3d at 129. The Commissioner attempts to do so on appeal, but ALJ Molleur's failure to properly apply the rule and discuss the reasons behind his findings constitutes legal error and justifies remand, at a minimum. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 344 n.4 (E.D.N.Y. 2010) ("Failure to satisfy the treating physician rule constitutes legal error . . .").

Accordingly, the Plaintiff's motion is granted, in part, and the Commissioner's motion is denied, on these grounds.

### iii.    Vocational Witness Testimony: The ALJ's Findings at Step Five

At Step Five, the ALJ bears the burden of establishing that the claimant's residual functional capacity will neither allow the performance of any past relevant work nor any other work that exists in significant numbers in the national economy, taking into account her physical capacity, age, education, experience, and training. 20 C.F.R. § 404.1520(g)(1).

Justin G. argues that because the ALJ's question to the vocational expert determining the jobs available to Jennipher B. was fundamentally flawed, ALJ Molleur was unable to carry his burden at Step Five.

The Commissioner argues that ALJ Molleur's hypothetical question simply mirrored Jennipher B.'s RFC and that Justin G.'s concerns are "merely derivative of her initial challenge to the ALJ's RFC determination" which he argues was supported by substantial evidence. Def.'s Mem. at 15.

The Court disagrees.

In the April 2024 hearing, ALJ Molleur asked the vocational expert what jobs would be available to a person with the following limitations:

> Such an individual is able to lift and carry ten pounds occasionally and she can stand and walk for up to four hours out of an eight-hour workday. She can sit for up to six hours out of an eight-hour workday. She isn't able to climb ladders, ropes, or scaffolds. She isn't able to kneel or crawl. She can occasionally climb ramps and stairs and occasionally stoop and crouch. She is limited to only frequent overhead reaching with the right upper extremity. She must avoid work at unprotected heights. She must avoid use of power tools or other sources of higher concentrations of vibrations. She should avoid work environments requiring exposure to extremes of heat. She must avoid work environments requiring exposure to higher concentrations of dust, fumes, gases, or other pulmonary irritants, or to higher concentrations of humidity. She can maintain concentration, persistence and pace for two-hour periods while performing simple and detailed but not complex instructions or tasks. And she can tolerate no more than occasional interactions with the general public.

Tr. at 12054. Justin G. argues that "significant elements of this hypothetical question find no support in the Record." Pl.'s Mem. at 29.

Dr. Imevbore, whose opinion is entitled to controlling weight unless inconsistent with other substantial evidence in the record, stated that Jennipher B. would "benefit from environmental modifications not limited to but including a clean, dust and mold free living environment." Tr. at 1293. Dr. Berry and Dr. Snyder both concurred with this opinion. In fact, in the April 2024 hearing, Dr. Berry had testified immediately preceding the vocational expert during which she stated that Jennipher B. "should avoid any place with pulmonary irritants," not

just areas with "higher concentrations" as posed by ALJ Molleur to the vocational expert. *Id.* at 12045. Justin G. also points to several other alleged inconsistencies, including limitations on kneeling, crouching, crawling, and heavy machinery identified by Dr. Berry, *id.* at 12046, the lifting and carrying limitations identified by Dr. Imevbore, *id.* at 15035, and the under-inclusiveness of the manipulative limitations imposed by the ALJ, *id.* at 12047.

"If a hypothetical question does not include all of a claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a [vocational expert's] response cannot constitute substantial evidence to support a conclusion of no disability." *Slattery v. Colvin*, 111 F. Supp. 3d 360, 375 (W.D.N.Y. 2015); *see also De Leon v. Sec'y of Health & Human Servs.,* 734 F.2d 930, 935–36 (2d Cir. 1984) (in determining claimant's RFC, ALJ improperly ignored psychologist's findings that claimant was of low intelligence and social comprehension). The concern is that if the hypothetical question posed to the vocational expert does not accurately reflect the claimant's limitations, then the expert's testimony will not accurately reflect the claimant's capacity for work. *See, e.g., Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) ("The hypothetical question on which the ALJ apparently based his finding . . . incorporated the ALJ's conclusion with respect to pain which we have found to be based on an erroneous standard . . . We therefore reverse the Secretary's determination that Mr. Aubeuf has the capacity to work as a security person and remand for reconsideration of Mr. Aubeuf's realistic capacity to perform an alternative job.").

Here, ALJ Molleur's legal errors give rise to this concern. If ALJ Molleur had fulfilled his obligation to develop the record, properly applied the treating physician rule, and presented the resulting RFC to the vocational expert, he could have relied on the vocational expert's testimony to support a conclusion of no disability. Without doing so, however, the RFC he

presented to the vocational expert, and the vocational expert's subsequent analysis, cannot

support the ALJ's findings at Step Five. *See Aubeuf*, 649 F.2d at 114 ("The vocational expert's

testimony is only useful if it addresses whether the particular claimant, with his limitations and

capabilities, can realistically perform a particular job.").

Accordingly, Justin G.'s motion is granted, and the Commissioner's motion is denied, on

these grounds.

### B.  Scope of Remand

"As the Second Circuit has noted, "[w]here application of the correct legal standard could

lead to only one conclusion, we need not remand." *Schaal*, 134 F.3d at 504; *see also Parker v.

Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("[W]e have reversed and ordered that benefits be paid

when the record provides persuasive proof of disability and a remand for further evidentiary

proceedings would serve no purpose."). However, where "application of the correct standard

does not lead inexorably to a single conclusion . . . the proper course is to direct that this case be

remanded to the [Social Security Administration] to allow the ALJ to reweigh the evidence . . .

developing the record as may be needed." *Schaal*, 134 F.3d at 505; *see also Rosa*, 168 F.3d at

82–83 ("Where there are gaps in the administrative record or the ALJ has applied an improper

legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further

development of the evidence.").

Here, the Court finds that "evidence of Plaintiff's limitations is not so overwhelming that

further proceedings would be pointless." *Baker v. Comm'r of Soc. Sec.*, No. 6:14-CV-1263

(GTS/WBC), 2015 WL 7574467, at *7 (N.D.N.Y. Nov. 3, 2015), *report and recommendation

adopted*, 2015 WL 7573223, at *1 (N.D.N.Y. Nov. 25, 2015).

Accordingly, the Court finds remand for further proceedings to be the most appropriate course of action.

### C. EAJA Fees

In order to obtain an award of attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), the moving party must show

> (1) that the claimant be a 'prevailing party'; (2) that the Government's position was not 'substantially justified'; (3) that no 'special circumstances make an award unjust'; and (4) pursuant to 28 U.S.C. § 2412(d)(1)(B), that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement.

*Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 189 (2d Cir. 2000) (quoting *Comm'r, INS v. Jean*, 496 U.S. 154, 158 (1990)). An award is permissible to "a prevailing party in a Social Security benefits case . . . if the Government's position in the litigation was not 'substantially justified.'" *Hogan v. Astrue*, 539 F. Supp. 2d 680, 682 (W.D.N.Y. 2008) (quoting 28 U.S.C. § 2412(d)(1)(A)). A position that is "substantially justified" is one "justified to a degree that could satisfy a reasonable person[,]" and "the Commissioner must demonstrate that his position had 'a reasonable basis both in law and fact.'" *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 81–82 (2d Cir. 2009) (quoting *Pierce v. Underwood*, 487 U.S. 552, 563, 565 (1988)). The burden rests on the fee applicant to establish "entitlement to an award and document[ ] the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Finally, the Act defines "final judgment" as "a judgment that is final and not appealable, and includes an order of settlement." *Id.* § 2412(d)(2)(G).

Under the EAJA, a party must move "within thirty days of final judgment in the action" for an award of attorney's fees. 28 U.S.C. § 2412(d)(1)(B). The Supreme Court has explained that § 2412(d)(2)(G) rewrites the traditional rule that a final judgment is one that is final and

appealable. *See Melkonyan v. Sullivan*, 501 U.S. 89, 95 (1991). Congress added this "unusual definition" to the statute in 1985 "to resolve a conflict in the lower courts on whether a 'judgment' was to be regarded as 'final' for EAJA purposes when it was entered, or only when the period for taking an appeal had lapsed.'" *Id.* at 95–96 (citation omitted). Thus, the Court held that a final judgment for purposes of § 2412(d)(1)(B) "means a judgment rendered by a court that terminates the civil action for which EAJA fees may be received. The 30–day EAJA clock begins to run after the time to appeal that 'final judgment' has expired." *Id.*

As a result, Justin G. may file a timely motion for EAJA fees, with the required documentation, to which the Commissioner will have an opportunity to respond. At this time, however, there is not a sufficient basis to approve an award of attorney's fees.

Accordingly, Justin G.'s motion for EAJA fees is denied without prejudice to renewal.

## IV.   CONCLUSION

For the reasons explained above, Justin G.'s motion is **GRANTED in part and DENIED in part**.

The Commissioner's motion for an order affirming his decision is **DENIED**.

The Commissioner's Decision is **VACATED** and **REMANDED** for further proceedings in accordance with this decision.

On remand, the Commissioner is **ORDERED** to make additional efforts to obtain medical source statements from Jennipher B.'s treating physicians, Dr. Riccio and Dr. Imevbore. The Court recognizes that Jennipher B.'s treating mental health provider is no longer employed at Cornell Scott Hill Health, and encourages Justin G. and the Commissioner to exercise their concurrent obligations to develop the record to obtain relevant evidence regarding Jennipher B.'s

mental health conditions during the contested time period. Any requests for information must delineate the time period in question, and must be worded in the past tense.

The Clerk of the Court is respectfully directed to enter judgment for Justin G., remand this case to the Commissioner for further proceedings, and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 21st day of February, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE